UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| |
|---|
| VELOCITY CAPITAL GROUP LLC,<br><br>                            Plaintiff,<br><br>                    v.<br><br>HUSSIAN COLLEGE, INC., JOSHUA DAVID FIGULI, and DAVID J. FIGULI,<br><br>                            Defendants. |
| HUSSIAN COLLEGE, INC., JOSHUA DAVID FIGULI, and DAVID J. FIGULI, on behalf of themselves and all similarly situated borrowers and guarantors,<br><br>                            Plaintiffs,<br><br>                    v.<br><br>VELOCITY CAPITAL GROUP LLC, JACOB AVIGDOR, ARENA INVESTORS, LP, JOHN DOES 1-100, and JOHN DOES 101-200,<br><br>                            Defendants. |

Case No.:  2:23-cv-05562-NJC-ST

## **VERIFIED ANSWER AND CLASS-ACTION COUNTERCLAIMS**

Defendants Hussian College, Inc. ("Hussian"), Joshua David Figuli ("Joshua Figuli"), and David J. Figuli ("David Figuli"; together with Hussian and Joshua Figuli, "Defendants"), by and through their attorneys, Halloran Farkas + Kittila LLP, respond to the Verified Complaint (the "Complaint") herein as follows:

1.      Defendants deny sufficient knowledge and information to form a belief as to the truth of the allegations contained in paragraph 1 of the Complaint.

2.      Defendants admit the allegations contained in paragraph 2 of the Complaint.

3.      Defendants admit that Joshua David Figuli was a resident of California from 2009 until August 2024 and deny the remaining allegations contained in paragraph 3 of the Complaint.

4.      Defendants deny the allegations contained in paragraph 4 of the Complaint.

5.      The purported contract referenced in paragraph 5 of the Complaint speaks for itself. To the extent that the allegations contained paragraph 5 of the Complaint require a further response, Defendants deny the allegations.

6.      The purported contract referenced in paragraph 6 of the Complaint speaks for itself. To the extent that the allegations contained in paragraph 6 of the Complaint require a further response, Hussian denies the allegations.  The allegations contained in paragraph 6 of the Complaint are not directed at Joshua or David and, therefore, no response from Joshua or David is required.  To the extent that response to the allegations contained in paragraph 6 of the Complaint require a response from Joshua or David, Joshua and David deny the allegations.

7.      The purported contract referenced in paragraph 7 of the Complaint speaks for itself. To the extent that the allegations contained in paragraph 7 of the Complaint require a response, Hussian denies the allegations.  The allegations contained in paragraph 7 of the Complaint are not directed at Joshua or David and, therefore, no response from Joshua or David is required.  To the extent that response to the allegations contained in paragraph 7 of the Complaint require a response from Joshua or David, Joshua and David deny the allegations.

8.      Hussian denies the allegations contains contained paragraph 8 of the Complaint. The document referenced in paragraph 8 of the Complaint speaks for itself.  The allegations contained in paragraph 8 of the Complaint are not directed at Joshua or David and, therefore, no response from Joshua or David is required.  To the extent that response to the allegations contained

in paragraph 8 of the Complaint require a response from Joshua or David, Joshua and David deny the allegations.

9.    Paragraph 9 of the Complaint contains legal conclusions as to which no response is required.  To the extent a response is required to the allegations contained in paragraph 9 of the Complaint, Hussian denies the allegations.  The allegations contained in paragraph 9 of the Complaint are not directed at Joshua or David and, therefore, no response from Joshua or David is required.  To the extent that response to the allegations contained in paragraph 9 of the Complaint require a response from Joshua or David, Joshua and David deny the allegations.

10.    Paragraph 10 of the Complaint contains legal conclusions as to which no response is required.  To the extent a response is required to the allegations contained in paragraph 10 of the Complaint, Hussian denies the allegations.  The allegations contained in paragraph 10 of the Complaint are not directed at Joshua or David and, therefore, no response from Joshua or David is required.  To the extent that response to the allegations contained in paragraph 10 of the Complaint require a response from Joshua or David, Joshua and David deny the allegations.

11.    Defendants refer to the documents referenced in paragraph 11 of the Complaint which speak for themselves.  To the extent that a further response is required, Defendants deny the allegations contained in paragraph 11 of the Complaint.

12.    Paragraph 12 of the Complaint contains legal conclusions as to which no response is required.  To the extent that a further response is required, Hussian denies the allegations contained in paragraph 12 of the Complaint.  The allegations contained in paragraph 12 of the Complaint are not directed at Joshua or David and, therefore, no response from Joshua or David is required.  To the extent that response to the allegations contained in paragraph 12 of the Complaint require a response from Joshua or David, Joshua and David deny the allegations.

13.     Paragraph 13 of the Complaint contains legal conclusions to which no response is required.   To the extent a response is required, Hussian denies the allegations contained in paragraph 13 of the Complaint.  The allegations contained in paragraph 13 of the Complaint are not directed at Joshua or David and, therefore, no response from Joshua or David is required.  To the extent that response to the allegations contained in paragraph 13 of the Complaint require a response from Joshua or David, Joshua and David deny the allegations.

14.     Paragraph 14 of the Complaint contains legal conclusions to which no response is required.  Defendants refers to the documents referenced in paragraph 14 of the Complaint which speak for themselves.  To the extent that a further response to Paragraph 14 of the Complaint is required, Hussian denies the allegations.   The allegations contained in paragraph 14 of the Complaint are not directed at Joshua or David and, therefore, no response from Joshua or David is required.   To the extent that response to the allegations contained in paragraph 14 of the Complaint require a response from Joshua or David, Joshua and David deny the allegations.

15.     The allegations in paragraph 15 of the Complaint contain legal conclusions as to which no response is required.  Defendants refer to the document referenced in paragraph 15 of the Complaint which speaks for itself.  To the extent that further response from Joshua is required to the allegations contained in paragraph 15 of the Complaint, Joshua denies the allegations contained in paragraph 15.  The allegations contained in paragraph 15 of the Complaint are not directed at Hussian or David and, therefore, no response from Hussian or David is required.  To the extent that response to the allegations contained in paragraph 15 of the Complaint require a response from Hussian or David, Hussian and David deny the allegations.

16.     The allegations in paragraph 16 of the Complaint contain legal conclusions as to which no response is required.  To the extent that further response from Joshua is required to the

allegations contained in paragraph 16 of the Complaint, Joshua denies the allegations contained in paragraph 16. The allegations contained in paragraph 16 of the Complaint are not directed at Hussian or David and, therefore, no response from Hussian or David is required. To the extent that response to the allegations contained in paragraph 16 of the Complaint require a response from Hussian or David, Hussian and David deny the allegations.

17.     The allegations in paragraph 17 of the Complaint contain legal conclusions as to which no response is required. Defendants refer to the document referenced in paragraph 17 of the Complaint which speaks for itself. To the extent that further response from Joshua is required to the allegations contained in paragraph 17 of the Complaint, Joshua denies the allegations contained in paragraph 17. The allegations contained in paragraph 17 of the Complaint are not directed at Hussian or David and, therefore, no response from Hussian or David is required. To the extent that response to the allegations contained in paragraph 17 of the Complaint require a response from Hussian or David, Hussian and David deny the allegations.

18.     The allegations in paragraph 18 of the Complaint contain legal conclusions as to which no response is required. Defendants refer to the document referenced in paragraph 18 of the Complaint which speaks for itself. To the extent that further response from David is required to the allegations contained in paragraph 18 of the Complaint, David denies the allegations contained in paragraph 18. The allegations contained in paragraph 18 of the Complaint are not directed at Hussian or Joshua and, therefore, no response from Hussian or Joshua is required. To the extent that response to the allegations contained in paragraph 18 of the Complaint require a response from Hussian or Joshua, Hussian and Joshua deny the allegations.

19.     The allegations in paragraph 19 of the Complaint contain legal conclusions as to which no response is required. Defendants refer to the document referenced in paragraph 19 which

speaks for itself.  To the extent that further response from David is required to the allegations contained in paragraph 19 of the Complaint, David denies the allegations contained in paragraph 19.  The allegations contained in paragraph 19 of the Complaint are not directed at Hussian or Joshua and, therefore, no response from Hussian or Joshua is required.  To the extent that response to the allegations contained in paragraph 19 of the Complaint require a response from Hussian or Joshua, Hussian and Joshua deny the allegations.

20.     The allegations in paragraph 20 of the Complaint contain legal conclusions as to which no response is required.  Defendants refer to the document referenced in paragraph 20 of the Complaint which speaks for itself.  To the extent that further response from David is required to the allegations contained in paragraph 20 of the Complaint, David denies the allegations contained in paragraph 20.  The allegations contained in paragraph 20 of the Complaint are not directed at Hussian or Joshua and, therefore, no response from Hussian or Joshua is required.  To the extent that response to the allegations contained in paragraph 20 of the Complaint require a response from Hussian or Joshua, Hussian and Joshua deny the allegations.

## GENERAL DENIAL

Except to the extent expressly stated herein, Defendants deny each and every allegation contained in the Complaint.  Further, Defendants expressly deny that Plaintiff is entitled to any of the relief sought in the Demand for Relief contained in the Complaint.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims fail because Plaintiff breached the parties' agreement by failing to comply with each every of its obligations under the parties contracts.

## THIRD AFFIRMATIVE DEFENSE

The parties' agreement is an unenforceable usurious loan.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of unclean hands because, among other reasons, plaintiff violated New York's criminal usury law and did not perform under the parties' agreements.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because the parties' agreements were procured by fraud and misrepresentation.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims of damages, if any, are subject to a set-off.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims should be dismissed on the basis of documentary evidence.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's alleged damages were caused by the conduct of Plaintiff or third parties not under Defendants' control, and not by any culpable conduct of Defendants.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff cannot have a recovery against Defendants when the revenue it claims to have purchased did not materialize.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff committed fraudulent acts which preclude recovery.

## ELEVENTH AFFIRMATIVE DEFENSE

Defendants reserve any and all defenses, at law or in equity, that may exist now or in the future based upon discovery and further investigation of this case.

**TWELFTH AFFIRMATIVE DEFENSE**

Defendants did not breach any alleged agreement with Plaintiff and no cause of action exists.

**THIRTEENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred by the doctrines of unclean hands, fraud, unconscionability, and bad faith. Plaintiff's alleged agreement constitutes a criminally usurious loan for which Plaintiff was not entitled to collect payments, and pursuant to which it is not entitled to any causes of action.

**FOURTEENTH AFFIRMATIVE DEFENSE**

Defendants acted at all times in good faith and in full compliance with all applicable law and without malice or intent to harm plaintiff.

**FIFTEENTH AFFIRMATIVE DEFENSE**

Plaintiff commenced this action for the purpose of harassing and maliciously injuring the Defendants in an attempt to force a settlement from the Defendants. The Plaintiff has no meritorious cause of action, and no right of recovery due to the nature of the transaction being a usurious loan at greater than 125% interest.

**SIXTEENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred by the implied covenant of good faith and fair dealing. The Plaintiff's transaction constitutes a criminally usurious loan at greater than 125% interest, for which plaintiff had no right to receive payments thereunder.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred by reason of Plaintiff's violation of deceptive business practices statutes, including without limitation N.Y. General Business Law § 349.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by reason that the parties' transaction constitutes a usurious loan in violation of N.Y. Penal Law §§ 190.40 and 190.42, 19 P.S. § 4806.2 *et seq.*, and other applicable law, and accordingly the parties' transaction is *void ab initio*.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by reason of Plaintiff's breach of the parties' agreement, Plaintiff collected monies from Hussian to which it was not entitled.

## DEMAND FOR JURY TRIAL

Defendants hereby demand a trial by jury on all claims so triable.

**WHEREFORE**, Defendants respectfully request that this Court:

(a)     Dismiss Plaintiff's Complaint with prejudice;

(b)     Award Defendants their attorneys' fees, expenses, and costs incurred in this action; and

(c)     Award Defendants such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS

Defendants-Counterclaim Plaintiffs Hussian College, Inc., David J. Figuli, and Joshua David Figuli by and through their attorneys bring as their counterclaims against counterclaim defendants Velocity Capital Group LLC, Jacob Avigdor, Arena Investments, LP, John Does 1-100, and John Does 101-200 (collectively, "Defendants") on behalf of themselves and on behalf of all other similarly situated borrowers and guarantors and allege as follows:

21.     This is a RICO action to recover damages arising from violation of the State of New York's criminal usury statute for damages caused to a class of borrowers and their guarantors, including Hussian and the Figulis arising from Defendants' actions to collect on illegal loans that charged interest rates that exceeded the legal rate in New York by more than double the legally

permitted interest rate. The most recent loan to Hussian was more than five-times the legal limit. To evade applicable usury statutes, the loans were disguised as a purchase and sale of future receivables agreements, but the loans' terms and conditions and the Defendants' actions demonstrate that despite the name of the agreements, no sales of receivables took place, and the agreements were intended to be, and always were treated as, loans. A copy of sample documentation showing the terms that Velocity typically used with borrowers and guarantors is attached hereto as Exhibit 1.

### The Parties

22.   Counterclaim plaintiff and borrower class representative, Hussian College, Inc. ("Hussian"), is a corporation formed under the laws of the Commonwealth of Pennsylvania with its primary place of business in Philadelphia. It provided undergraduate and graduate programs related to art, health sciences, business, technology and other career focused programs from certificates less than one year in length through the master's degree levels. Hussian received several loans from Velocity and until its final loan agreement, paid all of the required interest. Hussian began winding down operations in June 2023, collecting its final tranches of tuition and fees revenue in April 2023 all before it completed the process of repaying its final loan from VCG.

23.   Counterclaim plaintiff David J. Figuli ("DJF") is a citizen of Colorado and the indirect owner and direct guarantor of Hussian's earlier and final loans.

24.   Counterclaim plaintiff Joshua David Figuli ("JDF"; with DJF, the "Figulis") is a citizen of Colorado and the indirect owner and direct guarantor of Hussian's earlier and final loans. The Figulis are representatives of the guarantor class.

25.   Velocity Capital Group LLC ("VCG" or "Velocity") is a limited liability company formed under the laws of the state of New York with its principal place of business in Nassau County, New York.

26.     Jacob Avigdor ("Avigdor") is the founder, CEO, and Manager of VCG and is a citizen of the State of New York.

27.     Arena Investors, LP ("Arena") is a limited partnership formed under the laws of the state of Delaware with its principal place of business in the State of New York.  On information and belief, Arena has extended a $50 million line of credit to VCG.

28.     John Does 1-100 are entities or individuals that directly or indirectly acquired an interest in VCG in one more rounds of fund raising by VCG.

29.     John Does 101-200 are entities or individuals that directly or indirectly provide or provided financing to VCG to enable it to extend loans to Hussian and the remainder of the class plaintiffs.

30.     The borrower class is the group of borrowers who entered into agreements with Velocity on terms similar to those of Hussian since June 23, 2019.

31.     The guarantor class is the group of guarantors who entered into guarantees with respect to the loans entered into by the borrower class since June 23, 2019 on terms similar to the Figulis.

## FACTUAL BACKGROUND

32.     VCG tends to characterize itself as a merchant cash advance ("MCA") company that lends funds to merchants and small businesses that are in desperate need of cash.  It is a lender of last resort.

33.     From time-to-time, VCG and its counsel characterize VCG as a lender and the services it provides as lending.

### Hussian's Business

34.     Hussian was a private post-secondary school, established in 1946 as Hussian School of Art.

35.     In the 1940s, the Philadelphia Museum of Art encouraged John Hussian, a member of Philadelphia's art community and a renowned lecturer, to open a school to provide training in fine art for veterans returning from World War II.

36.     Hussian's first class commenced on July 1, 1946.

37.     In the 1960s, with John Hussian's guidance as president, the school shifted its curriculum to concentrate on commercial art.

38.     Hussian was incorporated on July 1, 1969.  John Hussian retired in 1973.

39.     In 2011, Education Equities Fund, LLC acquired Hussian.

40.     In November 2013, the Pennsylvania Department of Education granted Hussian the ability to confer a Bachelor of Fine Arts (BFA) degree.

41.     In January 2015, Hussian School of Art changed its name to Hussian College.

42.     The college was accredited by the Accrediting Commission of Career Schools and Colleges (ACCSC).

**Velocity's History As Hussian's Lender**

43.     Over the last several years of Hussian's operation, Hussian entered into several agreements to borrow from Velocity, each time repaying the principal plus interest at amounts that exceeded the legal interest rate.

44.     Hussian entered into the following loans with Velocity:

| Origination Date | Borrowed Amount ($) | Total Payments ($) | Daily Payment Amount ($) | Injury Amount ($) |
|---|---|---|---|---|
| December 7, 2020 | 427,335 | 630,000 | 26,250 | 202,665 |
| February 3, 2021 | 427,335 | 630,000 | 20,250 | 202,665 |
| May 3, 2021 | 617,335 | 910,000 | 37,917 | 292,665 |
| July 19, 2021 | 759,835 | 1,120,000 | 43,077 | 360,165 |

| Origination Date | Borrowed Amount ($) | Total Payments ($) | Daily Payment Amount ($) | Injury Amount ($) |
|---|---|---|---|---|
| October 12, 2021 | 1,044,835 | 1,540,000 | 495,165 | 59,231 |
| January 1, 2022 | 1,069,335 | 1,610,000 | 61,293 | 540,665 |
| February 14, 2023 | 418,335 | 630,000 | 4,500 | 211,665 |

45.    Payment of the illegal interest further exacerbated the financial troubles that Hussian encountered, as the loans from Velocity required to Hussian part with an excessive portion of its income just to meet the onerous and illegal payment terms imposed by the agreements with Velocity.

46.    Indeed as part of its illegal activities, Velocity, on behalf of the Enterprise (as defined below), extracted more in interest from Hussian than Hussian's limited resources could support, and these excessive and illegal interest charges were one of the factors that ultimately forced Hussian to close its doors and stop operating as an institution of higher education.

47.    Moreover, even as the interest charged by Velocity on behalf of the Enterprise was excessive, Velocity extracted more from Hussian than was permitted under its agreements. Velocity never returned the funds that it wrongfully extracted from Hussian's account.  Instead, Velocity applied those funds against Hussian's final loan, meaning that Hussian's own assets were part of the funds that were advanced to it.  Indeed, Velocity maintained a single ledger in which it recorded all transactions with Hussian, regardless of which loan related corresponded to the debt.

**The Loan Terms**

48.    Hussian entered into the loan from VCG on February 14, 2023 (the "Loan").  The form of this Loan was typical in language and terms as the other loans extended by Velocity on behalf of the Enterprise to Hussian and the class plaintiffs.

49.    The Loan's terms required that VCG advance $450,000 to Hussian and, in return, Hussian would make a $4,500 payment to VCG every business day until it had repaid the $450,000 to VCG plus $180,000 for a total amount of $630,000.  Hussian's Loan was documented on a standard form that Velocity also used with respect to loans that it made on behalf of the Enterprise to the class members.

50.    Notwithstanding its title, the Loan was not the sale/purchase of receivables:  it was a loan.

51.    The Loan had none of the indicia of a true sale and all the indicia of a loan.  Facts demonstrating this include, without limitation:  (i) the Loan required that the Purchased Amount be repaid from funds other than the purchased "Receipts"; (ii) the terms of the Loan failed to transfer the risk and benefits of the future receipts from Hussian to Velocity; (iii) the borrower remained absolutely liable for repayment of the "Purchased Amount"; (iv) Velocity had full recourse rights against Hussian and Figulis; and (v) the "Daily Payments" were fixed and required payment within the specific time period chosen by Velocity.  These terms and indicia are consistent with other loans made by Velocity on behalf of the Enterprise to Hussian and the class.

52.    Moreover, absolute title and ownership of the allegedly purchased receivables did not transfer from the borrower to Velocity.  The borrower remained responsible for generating and collecting the future revenue, it exercised complete dominion and control over the future revenue and it retained the risk of non-collectability.  Notwithstanding the agreements' language, all of the benefits and risks of ownership of the receipts remained with the borrower.

53.    Regardless of whether the borrower had daily revenue sufficient to support the remittance, it was required to ensure that the account was fully funded to support Velocity's ACH withdrawal.  Velocity did not have any risk of a daily revenue shortfall.

54.     Just as with a loan, if an event of default occurred, the loans accelerated and the full amount became immediately due and owing plus additional fees and costs.  Moreover, the borrower's failure to generate and collect sufficient revenue to make the daily remittance would automatically constitute an event of default.

55.     The loans did not have any provision that required Velocity to ensure that the daily remittances did not exceed the specified percentage of revenue that was paid.  Indeed, the adjustment provision is a sham reconciliation provision that was designed to give the loans the appearance of not having a definite term—a technique used in a misguided effort to avoid the prohibitions of the usury laws.  In a legitimate reconciliation provision, if a borrower pays more through its fixed daily payments than the specified percentage of its revenue, the borrower is entitled to receive the repayment of any excess money paid, so as to ensure that the collections do not exceed the purportedly purchased share of revenue.  The loans, however, do not require that an excess be refunded.  At most, under certain hard to accomplish conditions, the loans allow a brief reduction in daily remittances with an automatic reversion to the original amount even if revenue has not recovered.

56.     Although the face of the loan documentation does not specify the loans' duration, basic arithmetic allows the reader to calculate the duration.  For Hussian's final loan, the term was to be 140 business days—a little more than 28 weeks (accounting for bank holidays and weekends).  The same calculation can be made for other members of the class whose loans were made on the same and similar forms.

57.     The loans do not specify the applicable interest rate, but again, basic arithmetic can supply those rates.  For Hussian's final loan, the rate exceeded 125%.  This calculation can also be duplicated for the class members based whose loans were based on the same documentation.

58.    Upon an event of default, the loans accelerate and any portion of the purportedly purchased receivable that the borrower had not already paid to VCG becomes immediately due and owing, without regard to whether the receivables that VCG purportedly purchased actually materialized.  This demonstrates that VCG did not purchase receivables but instead extended money with a specified repayment schedule:  a loan.

59.    Velocity and Avigdor were well aware that the interest rates on the loans violated New York's criminal usury statute, the loans' documentation is replete with VCG's denials that it is a loan, and that interest is being paid, and asserting that the defense of usury is being waived. VCG's language seeks to recharacterize the loans as  purchases of future revenue.

60.    VCG's efforts to hide its criminal activity through its drafting of the loans' documentation include:

- Labeling the loans "Revenue Purchase Agreements";

- Stating that the borrower "is selling a portion of a future revenue stream to VCG at a discount, not borrowing money, therefore there is no interest rate or payment schedule and no time period during which" the loans must be repaid;

- Stating that the "Purchase Price is not intended to be, nor shall it be construed as a loan from VCG to [the borrower]";

- Writing that "[i]n no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law";

- "In the event that a court … determines that VCG has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and VCG shall promptly refund to [the borrower] any interest received by VCG in excess of the maximum lawful rate;"

- Stating that the borrower "knowingly and willingly waives the defense of Usury in any action or proceeding."

These writings and denials demonstrate that VCG knew that the loans violated New York's criminal usury statute and that VCG was going to extraordinary lengths to guard against the possibility that a borrower would later assert that the loans were usurious.

### The Payment Adjustment Provision

61.     The loans contain a provision that purports to, but does not, reconcile the borrower's payments to its revenue.  At Section 1.4, it states:

> If an Event of Default has not occurred, every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to VCG to request a decrease in the Remittance. The amount shall be decreased if the amount received by VCG was more than the Purchased Percentage of all revenue of Merchant since the date of this Revenue Purchase Agreement.  The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks.  Seller shall provide VCG with viewing access to their bank account as well as all information reasonably requested by VCG to properly calculate the Merchant's Remittance.  At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

62.     The Payment Adjustment Provision, however, has little practical value.  It does not reconcile payments made to VCG to revenue actually received by the borrower and require an immediate credit or debit to ensure that the borrower is neither underpaying nor overpaying VCG.

63.     Although it contains an adjustment concept, any adjustment to future payment is temporary and the borrower's payments automatically revert to original amount regardless of the borrower's actual received revenue or expected future revenue.

64.     Further, pursuant to Section 4.3 of the Loan, the adjustment to the borrower's payments can only be made on "notice" and the loans require that "[a]ll notices … shall be delivered by certified mail, return receipt requested, to [VCG]….  Notices to VCG shall become

effective only upon receipt by VCG." Thus, any adjustment to a borrower's payment will be further delayed.

65.    In addition, because VCG can make requests for information that it believes is reasonably necessary to determine the propriety of the borrower's request, VCG has the ability to further delay any adjustment and the discretion to reject the borrower's request to adjust the daily payment by seeking additional information.

66.    In addition to the onerous terms that VCG built into the loans to ensure that even if the anticipated receivables failed to materialize it would still be able to collect the full amount of the purchased receivables from the borrower, VCG also obtained a "Security Agreement" from the borrower that essentially placed a lien on anything of value that the borrower owned (or might own in the future) and personal guaranties from the (direct or indirect) owners of the borrower.

67.    Although VCG wanted to prevent the loans from being treated as a loan to avoid the consequences of New York's usury laws, VCG also sought to obtain the protections against default that are available to a secured lender.

68.    In the related "Security Agreement," VCG obtained "a security interest and lien upon:  (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory … now or hereafter owned or acquired by [the borrower or guarantors], (b) all proceeds … (c) all funds at any time in [the borrower's or the guarantors'] Account, regardless of the source of such funds, (d)  present and future Electronic Check Transactions, and (e) any amount which may be due to VCG …, including but not limited to all rights to receive any payments or credits."

69.    Per the Security Agreement, the borrower "agree[d] that, if any time, there are insufficient funds in [the borrower's] Account to cover VCG's entitlements under" the Loan, VCG

is granted a further security interest in all of [the borrower's] assets of any kind whatsoever, and that such assets become "Secured Assets."

70.    Thus, even if the purchased receivables never materialized, VCG had recourse to pursue essentially any other the borrower asset to obtain repayment of the loans.

71.    To further protect itself from the possibility that the purchased receivables would not materialize, VCG attempted to contract around the Bankruptcy Code's automatic stay (11 U.S.C. § 362(a)) by including in the Security Agreement that the borrower and the guarantors "agree that this is a contract of recoupment and VCG is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets."

72.    The loans' terms allow VCG, if the purchased receivables fail to materialize, to seize anything of value to satisfy the borrower's obligation to pay it the full purchased amount. Under the terms of the loans, VCG's right to seize anything of value exists even if the specified percentage of the borrower's future receivables was less than purchased amount or if the borrower files a petition for relief under the Bankruptcy Code.

73.    By its own terms, the Security Agreement is intended to "secure the obligations hereunder and under the [loan]."

74.    The Security Agreement also allows VCG to assume the borrower's leased premises, including "the right: (a) to enter [the borrower]'s premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign [the borrower]'s lease to another qualified business capable of operating a business comparable to [the borrower]'s at such premises."  Once again, this provision is designed to allow VCG to obtain the full remittance amount even if the specified percentage of the borrower's future receivables that VCG purportedly acquired were ultimately less than the full purchased amount.

**The Personal Guaranties Demonstrate That The Loan Is With Recourse.**

75.     In an effort to ensure that it would be paid in full, even if the borrower's future revenue was insufficient, VCG required that the borrowers' direct and indirect owners, provide personal guaranties that they would pay in the borrower's place.

76.     The personal guaranties provided that the guarantors "shall be jointly and severally liable for all amounts owed to VCG in the Event of Default."  The Figulis were required to provide such guarantees on behalf of Hussian.  In the case of many of Hussian's loans with VCG, the Figulis' signatures were procured through fraud and the Figulis did not become aware that their signatures had been forged through misuse of the Docusign platform.

77.     The guaranty states "[u]ntil the Purchased Amount and [the borrower's] other obligations to VCG under the [Loan] and this Agreement *are paid in full* Guarantor shall not seek reimbursement from [the borrower] or any other guarantor for any amount paid" under the Guaranty.  (Emphasis added.)

78.     As a specific example, Hussian ultimately had insufficient revenue to pay the remittances to VCG or even to continue operating and pay a reduced remittance.  It ceased collecting tuition and fees revenue from operations in April 2023 and suspended instructional operation as of August 2023.

79.     After the borrower closed its doors, effectively ending its revenue stream, VCG continued to pull, through ACH, every dollar it could find in the designated borrower payment accounts, regardless of the source (i.e., nominal collections on long past-due receivables or various refunds from cancelled vendor contracts) greatly hampering the wind-up efforts of Hussian and increasing the exposure of the Figulis to third-party creditors.  Further, VCG sought to collect on Hussian's loan, by bringing this case to collect on it.  It did so, despite the fact that the borrower had no revenue.  On information and belief, VCG has done the same with other borrowers.

80.     If VCG had truly purchased a specified percentage of the borrower's revenue up to a stated amount, as VCG claims, then VCG would simply be in possession of a non-performing asset—and have no recourse to collect any unpaid balance.  Instead, VCG is acting as a lender by seeking to recover against assets other than those that it purportedly acquired.

## VCG's Funding

81.     Jacob Avigdor founded VCG after short employment history at other MCA lenders.

82.     On information and belief, Avigdor founded VCG and began making loans using capital acquired from others.

83.     On information and belief, as VCG's business expanded, it raised additional capital through a Series A fundraising.  That successful fundraising resulted in additional equity holders joining as members in VCG.

84.     The additional members provided capital to VCG enabling it to significantly expand its lending operation.  VCG's new equity members are both entities and their ultimate human beneficial owners, John Does 1-100.

85.     In addition to raising additional capital through its successful Series A, on information and belief, VCG has access to additional capital through various loan structures.

86.     VCG has a $50 million line of credit from Arena.

87.     VCG borrows under its arrangements with John Does 101-200, and lends that money to borrowers with the expectation that it will extract sufficiently greater interest from its borrowers than it is required to pay to John Does 101-200.

## CLASS ACTION ALLEGATIONS

88.     Plaintiffs bring these counterclaims pursuant to Fed. R. Civ. P. 23, individually and on behalf of all other borrowers and guarantors who have been harmed as a result of Velocity usurious loan and related guarantees.

89.     These counterclaims are properly maintainable as a class action.

90.     The Class is so numerous that joinder of all members is impracticable.   On information and belief, during its history as a lender VCG has funded more than 25,000 clients.

91.     There are questions of law and fact common to the Class and that predominate over any issues affecting only individual Class members including, without limitation:

      (a)     Whether Velocity's loan documents are purchases of receivables or loans;

      (b)     Whether the payment adjustment provision included in the loan documents is fictitious or sham;

      (c)     Whether there is recourse in bankruptcy for debts arising out of the loans;

      (d)     Whether Velocity assumed the risk that the purchased receivables would perform; and

      (e)     Whether there is a presumptive duration for the loans.

92.     Plaintiffs' claims arise out of the same form documents as those of the class members, making interpretation of the contracts at issue common to all members of the class.

93.     Plaintiffs are committed to prosecuting this action.  Plaintiffs' claims are typical of the claims of the other Class members, and Plaintiffs have the same interest as other members of the Class and will fairly and adequately protect the interests of the Class.

94.     The prosecution of separate actions by individual members of the Class would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the Defendants; or (b) adjudications with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

95.     Defendants have acted, or refused to act, on grounds generally applicable to the Class with respect to matters complained of herein, thereby making appropriate the relief sought herein with respect to Class as a whole.

96.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation makes it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.  Plaintiffs anticipate that there will be no difficulty in the management of this litigation as a class action.

97.     The loan documentation contains a class action waiver.  However, because the loans are *void ab initio* by application of New York's usury laws, that provision cannot be enforced.  *See, e.g.*, *Moss v. First Premier Bank*, 2020 WL 5231320, at *4–5 (E.D.N.Y. Sept. 2, 2020).

## FIRST CAUSE OF ACTION
## RICO (18 U.S.C. § 1962(C))

98.     Plaintiffs repeat and reallege the allegations contained in paragraphs 21-97 as if more fully set forth herein.

### Culpable People

99.     Velocity, Avigdor, Arena, John Does 1-100, and John Does 101-200 are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is an individual, corporation, or limited liability company capable of holding an interest in real property.

100.     At all relevant times, each of Velocity, Avigdor, Arena, John Does 1-100, and John Does 101-200 was, and is, a person that exist separate and distinct from the RICO enterprise described below.

101.    Velocity is a limited liability company organized and existing under the laws of the State of New York.

102.    Avigdor is the managing member and *de facto* chief executive officer of Velocity. He is also a member of Velocity.

103.    Upon information and belief, Velocity solicits, underwrites, funds, services, and collects upon debts incurred by small business in states that do not have usury laws.

104.    Arena is a limited partnership existing under the laws of Delaware that provides funding to the Enterprise through a credit arrangement with Velocity.

105.    John Does 1-100 are members of Velocity who have provided equity capital to Velocity to allow it to extend unlawful usurious loans on behalf of the Enterprise.

106.    John Does 101-200 lend funds to Velocity so that it can extend unlawful usurious loans on behalf of the Enterprise.

**The Enterprise**

107.    Velocity, Avigdor, Arena, John Does 1-100, and John Does 101-200 constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

108.    Velocity, Avigdor, Arena, John Does 1-100, and John Does 101-200 are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing, and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

109.    Upon information and belief, since at least 2018 and continuing through the present, the members of the Enterprise have had ongoing relations with each other and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing, and

collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States, including the borrower and the other members of the class.

110.    The debt, including such debt evidence by the agreements, constitutes an unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) because (i) it violates applicable usury statutes and (ii) the rates are more than twice the legal rate.  Here, the annualized rate charged to the borrower exceeded 125%, a rate that is more than five (5) times the maximum twenty-five percent (25%) permitted to be charged under New York Penal Law § 190.40.  Loan agreements with the class members contain similar unlawful interest rates that more than double the legally permitted rate.

## Each Member's Role In The Enterprise

111.    The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts.  Generally speaking, Velocity and Avigdor solicit the merchants, underwrite the transactions, and enter into merchant agreements. John Does 1-100 invested capital in Velocity to enable it to fund the merchant agreements.  Arena and John Does 101-200 provide Velocity with access to additional capital pursuant to one or credit agreements from which Velocity can draw upon to fund merchant agreements.  Velocity and Avigdor collect the proceeds of the usurious loans and distribute a portion of ill-gotten proceeds to John Does 1-100 and use the ill-gotten proceeds to pay interest to Arena and John Does 101-200.

## Avigdor

112.    Upon information and belief, Avigdor is the founder, a member of, chief underwriter, and chief executive officer of Velocity.  Upon information and belief, Avigdor is responsible for the day-to-day operations of the Enterprise and has final say on all business

decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, and the ultimate payment terms, amount, and period of each usurious loan, including the Agreement.

113.    Upon information and belief, in his capacity as the day-to-day leader of the Enterprise, Avigdor is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes, including:  (i) the merchants to whom the Enterprise will lend funds; (ii) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of unlawful debt; (iii) the amount and repayment period of the usurious loans extended by the Enterprise to merchants; and (iv) the method of collecting the dialing payments via ACH withdrawals.  All such forms were used to make and collect upon the unlawful loans including, without limitation, the loans extended to the borrower and the class under the Agreements.

114.    Avigdor also has taken actions and directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing members of the Enterprise to make loans to merchants, to fund only certain amounts of those loans and to collect upon the unlawful loans.

115.    Through salary, bonuses, profits, and/or other distributions by Velocity, Avigdor has ultimately benefited from the Enterprise's funneling a portion or all of the usurious loan proceeds to Velocity.

**<u>Velocity</u>**

116.    Directly and through Avigdor and its other employees and officers, Velocity has been and continues to be responsible for:  (i) entering into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with investors to fund

the usurious loans; (ii) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iii) entering into the so-called merchant agreements on behalf of the Enterprise; (iv) setting up the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtaining judgments in its name to further collect upon the unlawful debt when a merchant defaults.

117.    In this case, Velocity:  (i) entered into a contract with a broker to solicit borrowers, including the borrower and members of the class; (ii) underwrote the Agreement; (iii) entered into the agreements; (iv) solicited the information needed to collect upon the unlawful debt evidenced by the agreements by effecting daily ACH withdrawals from the borrowers' accounts; (v) sent correspondence seeking payment of the unlawful debt; (vi) failed and refused to return the usurious interest charged and collected under the agreements; (vii) funded the amounts loaned to Hussian and the class members by wire transfer from its banks accounts; (viii) communicated with the borrowers through email; and (ix) collected the daily payments through the ACH withdrawals from the borrowers' designated account into Velocity's account.

118.    Upon information and belief, Velocity benefits from the Enterprise's unlawful activity by retaining a portion of the proceeds of the unlawful debt collected by the Enterprise.

### John Does 1-100

119.    John Does 1-100 are members of Velocity and contributed capital to Velocity with the knowledge and intent that contributed capital be used for the purpose of enabling Velocity to expand its business of soliciting, underwriting, funding, and collecting upon illegal usurious loans on behalf of the Enterprise.

120.    On information and belief, Velocity conducted a Series A offering and obtained a $5 million investment prior to December 13, 2018, from one or more of John Does 1-100.

121.    John Does 1-100 benefit from the Enterprise's unlawful activity by receiving and retaining a share of the proceeds of the unlawful debt collected by the Enterprise.

**Arena**

122.    On information and belief, Arena provides Velocity with debt financing to support its activities and those of the Enterprise.  On information and belief, before agreeing to lend funds to Velocity, Arena investigated Velocity's business and learned that Velocity makes unlawful usurious loans.  On information and belief with the benefit of that knowledge, Arena joined the Enterprise and provides funds that Velocity uses to solicit, underwrite, fund, and collect upon illegal usurious loans on behalf of the Enterprise.  On information and belief, Arena extends the loans to Velocity purposely to support and enable the Enterprise to engage in its unlawful activity.

123.    On information and belief, Arena provides $50 million of debt financing to Velocity.

124.    On information and belief, Arena benefits from the Enterprise's unlawful activity by receiving and retaining a share of the proceeds of the unlawful debt collected by the Enterprise.

**John Does 101-200**

125.    On information and belief, John Does 101-200 provide Velocity with debt financing to support its activities and those of the Enterprise.  John Does 101-200 lend funds to Velocity knowing that Velocity uses those funds to solicit, underwrite, fund and collect upon illegal usurious loans on behalf of the Enterprise.  John Does 101-200 extend the loans to Velocity purposely to support and enable the Enterprise to engage in its unlawful activity.

126.    On information and belief, before December 13, 2018, Velocity obtained $15 million in debt financing from one or more John Does 101-200.

127.    On information and belief, John Does 101-200 benefit from the Enterprise's unlawful activity by receiving and retaining a share of the proceeds of the unlawful debt collected by the Enterprise.

**Interstate Commerce**

128.    The Enterprise is engaged in interstate commerce and use instrumentalities of interstate commerce in its daily business activities.

129.    Specifically, members of the Enterprise maintain offices in New York, Florida, the United Kingdom, Ireland, Singapore, and elsewhere and use personnel located in New York to originate, underwrite, fund, service, and collect upon usurious loans made by the Enterprise to entities in Pennsylvania and throughout the United States via extensive use of interstate emails, mail, wire transfers, and bank withdrawals processed through an automated clearing house.

130.    In the present case, all communications between the members of the Enterprise and Plaintiffs were by interstate mail, email, telephone, wire transfers, ACH debits, and other interstate wire communications.  Specifically, the Enterprise used interstate emails to originate, underwrite, service, and collect upon the agreements, fund the advance under the Agreement and collect the Daily Payments via interstate electronic ACH debits.  In addition, at the direction of Avigdor, some of the agreements executed by David J. Figuli and Joshua David Figuli, on behalf of the Hussian and individually as guarantors, and the original copy of the agreement was executed in virtual form through the services of Docusign and transmitted electronically across state lines.  The guarantor class members executed similar documentation.  In other situations signatures of the guarantors and representatives of the borrowers were procured through fraud and are forgeries.

**Injury and Causation**

131.    Plaintiffs have and will continue to be injured in their business and property by reason of Defendants' violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(c) include, without limitation, the millions of dollars paid to the Defendants by the Plaintiffs or otherwise collected by the Defendants on account of the usurious and otherwise unenforceable agreements and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and prosecuting the Defendants' unlawful activities.

132.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## COUNT II
## (CONSPIRACY UNDER 18 U.S.C. § 1962(D))

133.    Plaintiffs repeat and reallege the allegations contained in paragraph 21-132 as if more fully repeated herein.

134.    The Defendants have unlawfully, knowingly, and willingly combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

135.    By and through each of the Defendants' business relationships with one another, including employees and services, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing, and collection of the unlawful loans, including the agreements, each Defendant knew the nature of the Enterprise and each of the Defendants knew that the Enterprise extended beyond each individual Defendant's role.  Moreover, through the same connections and coordination, each of the Defendants knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

136.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the agreements in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund, and collect upon unlawful debts, including the Agreement.

137.    More particular to this case, Velocity underwrote and entered into the agreements and funded and collected upon the loans by:  (i) having its representatives use email to service the loans; and (ii) by using its letterhead, it directed the borrowers to make payments under the loan to Velocity's bank account.

138.    John Does 1-100 and Avigor provided equity funding to enable Velocity to solicit, underwrite, fund, and collect upon unlawful debts, including the agreements with the borrower class members.

139.    Arena and John Does 101-200 provided debt funding to enable to Velocity to solicit, underwrite, fund, and collect upon unlawful debts, including the agreements with the borrower class members

140.    The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

141.    Plaintiffs have been and will continue to be injured in their business and property by reason of Defendants' violations of 19 U.S.C. § 1962(d), in an amount to be determined at trial. The injuries to the Plaintiffs directly, proximately, and reasonably foreseeable resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars

in improperly collected loan payments and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and prosecuting the RICO Defendants' criminal activities.

142.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus attorneys' fees and costs from the Defendants.

**WHEREFORE**, Plaintiffs seek entry of a judgment against the Counterclaim Defendants as follows:

A.    On the First Count, awarding actual damages in an amount to be determined at trial, and treble damages;

B.    On the Second Count, awarding actual damages in an amount to be determined at trial, and treble damages;

C.    An award of attorneys' fees and costs in an amount to be determined at trial; and

D.    Such other and further relief as the Court shall deem just and proper.

Dated: New York, New York
        December 10, 2024

  /s/  *Jeffrey M. Greilsheimer*
Jeffrey M. Greilsheimer
HALLORAN FARKAS + KITTILA LLP
600 Madison Avenue, 2d Floor
New York, New York  10016
646-825-2390
jg@hfk.law

*Attorneys for Defendants-Counterclaim Plaintiffs Hussian College Inc., Joshua David Figuli and David J. Figuli*

32

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| VELOCITY CAPITAL GROUP LLC,<br><br>                                    Plaintiff,<br><br>                    v.<br><br>HUSSIAN COLLEGE, INC., JOSHUA DAVID<br>FIGULI, and DAVID J. FIGULI,<br><br>                                    Defendants. | Case No.:  2:23-cv-05562-NJC-ST |
| HUSSIAN COLLEGE, INC., JOSHUA DAVID<br>FIGULI, and DAVID J. FIGULI, on behalf of<br>themselves and all similarly situated borrowers and<br>guarantors,<br><br>                                    Plaintiffs,<br><br>                    v.<br><br>VELOCITY CAPITAL GROUP LLC, JACOB<br>AVIGDOR, ARENA INVESTORS, LP, JOHN<br>DOES 1-100, and JOHN DOES 101-200,<br><br>                                    Defendants. | |

## **VERIFICATION**

I make this Verification on behalf of myself and as the authorized representative of Hussian College Inc.  I have read the foregoing Answer and Verified Complaint and know the contents thereof; that the same is true to my knowledge except those matters stated to be alleged on information and belief, and as to those matters I believe them to be true.  The grounds for my belief in those matters herein not stated upon my knowledge is based upon the records in my possession.

I declare that the under penalty of perjury that foregoing is true and correct.

Executed on December 9, 2024.

_____
JOSHUA DAVID FIGULI
Individually and as Authorized
Representative of Hussian College, Inc.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

VELOCITY CAPITAL GROUP LLC,

Plaintiff,

v.

HUSSIAN COLLEGE, INC., JOSHUA DAVID
FIGULI, and DAVID J. FIGULI.

Defendants.

Case No.: 2:23-cv-05562-NJC-ST

HUSSIAN COLLEGE, INC., JOSHUA DAVID
FIGULI, and DAVID J. FIGULI, on behalf of
themselves and all similarly situated borrowers and
guarantors,

Plaintiffs,

v.

VELOCITY CAPITAL GROUP LLC, JACOB
AVIGDOR, ARENA INVESTORS, LP, JOHN
DOES 1-100, and JOHN DOES 101-200,

Defendants.

## VERIFICATION

I have read the foregoing Answer and Verified Complaint and know the contents thereof;

that the same is true to my knowledge except those matters stated to be alleged on information and

belief, and as to those matters I believe them to be true. The grounds for my belief in those matters

herein not stated upon my knowledge is based upon the records in my possession.

I declare that the under penalty of perjury that foregoing is true and correct.

Executed on December 9, 2024.



DAVID J. FIGULI